OPINION
Defendant-Appellant Andre Sinkfield appeals his convictions for one count of aggravated murder, one count of attempted aggravated murder, three counts of aggravated robbery, and one count of having weapons under disability, as well as firearm specifications for the first five counts. This is Sinkfield's third conviction for these crimes, this court having reversed and remanded his convictions twice. See State v. Sinkfield (May 5, 2000), Montgomery App. No. 17690, unreported; State v. Sinkfield (Oct. 2, 1998), Montgomery App. No. 16277, unreported. In his current appeal, Sinkfield has raised the following six assignments of error:
 I. The judgment is against the manifest weight of the evidence.
 II. The trial court erred to the prejudice of the defendant in excluding the testimony of Rod Garrett as to the excited utterances of Jeffrey Stevens which were admissible under Ev.R 803(2).
 III. The trial court erred to the prejudice of the defendant in excluding the testimony of Rod Garrett as to the statement of Jeffrey Stevens in violation of the Due Process Clause, and the Compulsory Process Clause of the United States Constitution and Article I
Section 10 of the Ohio Constitution.
 IV. The trial court erred to the prejudice of defendant in excluding the testimony of Karleia Gray as to the statements Rod Garrett made to her which were admissible as an: (A) excited utterance under Ev.R. 803(2); (B) present sense impression under Ev.R. 803(1); and (C) the Due Process Clause and Compulsory Process Clause of the United States Constitution and Article I Section 10 of the Ohio Constitution.
 V. The trial court abused its discretion and erred to the prejudice of defendant in excluding the testimony of Michael Stroud.
 VI. The trial court erred to the prejudice of defendant in admitting over objection the rebuttal testimony of Detective Burke.
 I
Portions of the following recitation of facts are derived from our previous case, State v. Sinkfield (May 5, 2000), Montgomery App. No. 17690, unreported.
The night of February 3, 1996, Billy Vance and his friend, James Brown, were at Vance's home at 952 Iola Avenue in Dayton. At about 11:15 p.m., Brendan Byrdsong and Jay Washington arrived. Vance, Byrdsong, and Washington smoked some marijuana, and the four men watched basketball on television. Not long after Byrdsong and Washington arrived, Vance's telephone rang and Washington answered and had a short conversation, then hung up the phone. About five minutes later, there was a knock at the door. Vance hollered, "Come in," and Washington went to open the door. Before he could do so, however, two men entered the house. Vance recognized one of them and said, "What's up, Turtle Man?" As Turtle and his companion drew guns, Turtle, later identified as Jeffrey Stevens, replied, "You know what's up. This is a robbery." Stevens then ordered Vance and the others to lie down on the floor. Vance tossed his wallet down then complied with Stevens' demand, as did Brown and Byrdsong, but Washington did not. After Stevens went into Vance's bedroom and returned, he and his accomplice put pillows over Vance's and Byrdsong's heads. Stevens pushed his gun against the pillow covering Vance's head and pulled the trigger, but nothing happened. He exchanged guns with his accomplice and fired a bullet through the pillow and into Vance's head. Within minutes, Vance died.
After Vance was shot, Brown decided he was not going to be next, so he jumped up and rushed the assailants, pushing them into another room. Seeing his chance to escape, Byrdsong fled outside, eventually running next door where Vance's brother, James Townsend, lived. Meanwhile, Brown managed to push Stevens to the ground and run for the door, but was shot in the back by one of the gunmen, who then ran from the house. Although less than conclusive, the evidence suggests that Washington fled with the assailants.
After Byrdsong frantically told Townsend of the trouble at Vance's house, they ran next door where he found Brown in pain on the front porch, afraid he was dying. Townsend proceeded into the house and discovered his brother dying on the floor. He questioned Vance about who had shot him and Vance tried to respond, but Townsend could only make out a "T" sound. Townsend went back out to the porch and asked Brown who was responsible. Brown mentioned the name Turtle, as well as "Keith DeWitt's boys." Paramedics and police arrived on the scene and transported Brown to the hospital. He later learned that the bullet had severed his spine, leaving him permanently paralyzed.
Initially, Keith DeWitt was arrested for the crimes after his name was mentioned at the scene. DeWitt is apparently known and feared by many people in the community. Within a few days of the shooting, however, Brown viewed three photo spreads prepared by the police and identified Stevens and Sinkfield as the assailants. Brown testified that he did not know Stevens prior to February 3, 1996, and did not know Sinkfield by name, but had seen him twice a few years earlier. Brown recognized DeWitt in the third photo spread, but advised the officers that he was not at the scene. As a result, DeWitt was released and Stevens and Sinkfield were eventually arrested.
The same photo spreads shown to Brown were also taken to Byrdsong. However, after he identified Stevens in one photo spread, he claimed he was too frightened to view any more. Therefore, he only identified Sinkfield as the perpetrator in the courtroom. Byrdsong also did not know Stevens or Sinkfield prior to February 3, 1996.
Both Charles Sinkfield, brother of the defendant, and Tony Hill, friend of the defendant, testified regarding an alleged conversation between Keith DeWitt and Henry Watson. During this conversation, Watson apologized to DeWitt for getting his name mixed up in his and Turtle's business. Watson further explained to DeWitt that "they" wore hats and DeWitt's name was never mentioned "going in or out." Moreover, Hill testified that at the last trial, he overheard James Brown in the hallway of the courthouse say that he did not want to testify against Sinkfield because "it wasn't him."
Another witness for the defense, Tasha Matthews, testified that she arrived at Rod Garrett's house at approximately 9:00 to 9:30 p.m. on February 3, 1996 to see Stevens, who was apparently staying there. Stevens was there alone when she arrived. Just before she left around 11:00 p.m., Watson arrived. When she left, Stevens and Watson were still in the house.
The defense called Stevens to testify. At the time of this trial, Stevens had already been convicted and sentenced for his participation in these crimes. Stevens admitted that he had known defendant for fifteen years, but they never "hung out." He had a similar relationship with DeWitt, Hill and Charles Sinkfield. On the other hand, he testified Watson had been his "associate" for a long time. Stevens' version of events on February 3, 1996 conflicted with all other testimony. He agreed that he had seen Watson earlier that evening at Garrett's house. However, he claimed Garrett planned to rob Vance, and Stevens loaned Watson two hundred dollars for an unknown reason. Then Stevens also went to Iola Avenue that night to see if Watson would "pull it off" so Stevens could then rob Watson. Unfortunately though, Stevens allegedly saw Watson running from 952 Iola with DeWitt, so he changed his mind about the robbery.
Henry Watson testified that he and Stevens had been friends since junior high school. He confirmed that he had seen Stevens earlier that night at Garrett's, who was also a friend, but denied any involvement in the crimes. While on the stand, the defense attorney pointed out the similar physical characteristics of Watson and Sinkfield.
Testimony was admitted from Rod Garrett, who knew defendant, but was good friends with both Stevens and Watson. Garrett testified that very soon after the murder and robberies, he received a phone call from Stevens, giving him information about who committed the crimes in a very small, shaky voice. However, the actual statement made by Stevens was not admitted. Further, Karleia Gray, Garrett's girlfriend, testified that she had been on the phone with Garrett when call waiting beeped for Garrett. After a few minutes of being on hold, she hung up. Soon after, Garrett called her back and in a nervous, excited voice, told her what Stevens had said.
Nedra Taylor and her mother both testified as alibi witnesses for Sinkfield. They indicated that Nedra and Sinkfield arrived at the Taylor home at approximately ten o'clock at night on February 3rd. Mrs. Taylor spoke to them briefly, then the two went down into the basement. Sometime later, Tiffany Moon came over to the house. The time that she arrived was not clearly established. At approximately one A.M., Nedra and Sinkfield left to get something to eat, and Tiffany remained to babysit Nedra's son. Mrs. Taylor testified that she has an alarm on her doors, so she can hear a beep every time they open. She heard them beep three times after Sinkfield and Nedra arrived: when Tiffany came over, when Nedra and Sinkfield left, and when Tiffany left.
When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387. A verdict should only be overturned in extra ordinary situations when evidence weighs heavily against the conviction. Id. However, we will not disturb the jury's determination of witness credibility and conflicting testimony unless "it is so incredible that it defies belief." Fairborn v. Boles (May 15, 1998), Greene App. No. 97-CA-110, unreported, at p. 3.
After reviewing the evidence in this case, we find that there was some testimony that was so incredible that it defied belief. Unfortunately, much of the incredible testimony was elicited from defense witnesses. Because the testimony presented in this case was so conflicting, the determination of guilt almost completely depended on the jury's resolution of witness credibility. Although we do find this case to be closer than most, after considering all of the evidence, we do not find that the jury clearly lost its way by finding Sinkfield guilty of the crimes. Consequently, the verdict was not against the manifest weight of the evidence, and Sinkfield's first assignment of error is overruled.
 II, III
Because the second and third assignments of error pertain to the same issue, we will address them together. Sinkfield argues that the trial court erred in prohibiting Rod Garrett to testify as to the content of Stevens' alleged phone call following the murder. Testimony indicated that the crimes occurred around 11:40 to 11:45 p.m. and the phone call was made at approximately 12:30 a.m. Garrett testified that Stevens' voice was small and shaky, and he seemed upset when he called, but was not excited. While Garrett was speaking, Stevens cut him off to tell him something. Garrett's proffered testimony revealed that Stevens told him he and Henry Watson "just killed Billy Blast [Vance]."
Sinkfield argued the admissibility of this statement under Evid.R. 803(2), as an excited utterance, which is defined as:
 A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
Evid.R. 803(2). The Ohio Supreme Court has set forth a four-part test that must be satisfied in order to admit a statement under the excited utterance hearsay exception. The statement may be admissible if the judge reasonably finds:
 (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,
 (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
 (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.
State v. Taylor (1993), 66 Ohio St.3d 295, 300, citing Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus. Based on this test, the central key in determining whether a statement is admissible is whether, when made, the declarant is still under the stress of the event such that the statement is not a product of reflective thought. Id. at 303. Merely being upset is insufficient to satisfy this hurdle, because it does not reliably indicate that the declarant has not had time to reflect on the event. Id.
After considering the facts, and the four-part test set forth in Taylor, we find this to be a very close case for an excited utterance exception. The Taylor court provided guidance in such a situation by recognizing that in some instances, admitting the evidence may be just as reasonable not admitting it, and vice versa. Id. at 304. In that situation, as long as the trial court's resolution of the facts which supported his decision was reasonable, the decision should not be disturbed. In other words:
 we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision.
Id. at 305. We believe the trial court's decision in excluding this testimony as hearsay was a reasonable one, and therefore, it will not be disturbed.
Sinkfield also argues exclusion of Garrett's testimony was a violation of the Due Process Clause and the Compulsory Process Clause of the United States and Ohio Constitutions pursuant to Chambers v. Mississippi (1973), 410 U.S. 284, 93 S.Ct. 1038. Initially, we recognize that a defendant's right to due process essentially affords him a "fair opportunity to defend against the State's accusations." Id. at 294,93 S.Ct. at 1045. In fact, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Id. at p. 302,93 S.Ct. at 1049. However, when exercising this right, the accused, just like the state, must comply with established rules formulated to ensure fairness and reliability. Id.
The facts in Chambers are similar to the present case in that both present a defense that another person is responsible for the crime; in Chambers, the defense accused McDonald. Sinkfield focuses on Chamber's admissibility analysis of three separate statements McDonald allegedly made to three friends, wherein he confessed to committing the crime. Id. at 292-93, 93 S.Ct. at 1044-45. The Chambers Court analyzed the admissibility of these statements under the rubric of the statement against penal interest hearsay exception.
The Court acknowledged that McDonald's statements sought to be admitted by Chambers were technically hearsay because they were out-of-court statements which did not fall into an established hearsay exception.[1]
Id. at 299, 93 S.Ct. at 1048. However, the Court found that the statements were made under circumstances that provided considerable assurances of reliability. First, all three statements were made by McDonald spontaneously to a friend within twelve hours of the murder. Second, the confessions were corroborated by other evidence, including a sworn confession (which was later repudiated), testimony of an eyewitness to the crime, testimony that McDonald was seen with a gun after the shooting, and testimony that McDonald owned a .22-caliber gun. Third, each confession had an indicia of reliability because it was completely self-incriminatory and therefore undeniably against his own interest. Finally, the Court explained that any question about the reliability of the out-of-court statements could be addressed during the state's cross-examination of McDonald since he did testify at the trial.[2]
Id. at 300-01, 93 S.Ct. at 1048-49.
Based on these factors, the Court found that even though no rule of evidence specifically allowed the admission of McDonald's statements, they bore persuasive assurances of trustworthiness which formed the basic rationale of the statement against interest exception. The Court further held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id. at 303,93 S.Ct. at 1049.
When performing a similar analysis in the present case, we do not come to the same conclusion. First, we do have a statement made soon after the murder occurred. Second, there was some evidence admitted that could have corroborated Watson's involvement in the crime. However, "[t]he determination of whether there are corroborating circumstances clearly indicating the trustworthiness of a statement rests within the discretion of the trial court." State v. Childs (Sept. 11, 1998), Montgomery App. No. 16325, unreported, at p. 9, citing State v. Landrum (1990),53 Ohio St.3d 107, 114. In addition, "[t]he inference of trustworthiness from the corroborating circumstances must be strong and not merely allowable." Id. Other potentially corroborating evidence included Charles Sinkfield and Hill's testimony regarding Watson's implied confession to DeWitt, Watson's relationship with Stevens, Stevens' testimony that Watson was the perpetrator, and Watson's similar physical appearance to Sinkfield. Much of this evidence was highly dependent on the credibility of the witness testifying, so it would be difficult to find the trial court abused its discretion if it was discounted.
Third, and most significantly, the statement sought to be introduced by Sinkfield was not made by Watson, the individual Sinkfield was attempting to implicate. Instead, the statement was made by Stevens, to Garrett, implicating both Stevens and Watson. Sinkfield is not interested in Stevens' confession, only Stevens' statement implicating Watson. The United States Supreme Court has addressed the reliability of other information incorporated into statements against interest. Williamson v. United States (1994), 512 U.S. 594, 114 S.Ct. 2431.
The Court held that statements made collateral to self-inculpatory statements should not be treated any differently than other excluded hearsay statements. Further, the Court held that a "court may not just assume * * * that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." Id. at 601. While Williams involved a statement which implicated the declarant and the defendant, we believe the holding applies regardless of who else the declarant is implicating. If the Court had intended to only exclude from the statement against interest exception statements inculpating the defendant, it would have specified defendant instead of saying "someone else."
In any event, the phone call did not constitute a statement made by Watson against his own interest, as with the statements made in Chambers. Instead, it was a statement by Stevens, implicating himself and "someone else," which does not carry the same indicia of reliability as a truly self-inculpatory statement.
We agree with Sinkfield that statements that do not specifically fall under an established hearsay exception may be admissible under the Compulsory Process or Due Process Clauses of the Constitutions. However, after conducting a Chambers analysis in this case, we do not find that either clause was violated here. Accordingly, we find that the trial court did not err in preventing the admission of Garrett's testimony regarding Steven's alleged phone call. Sinkfield's second and third assignments of error are overruled.
 IV
In his fourth assignment of error, Sinkfield argues that Karleia Gray's testimony should have been admitted for the same reasons as Garrett's, with the additional basis of present sense impression. Sinkfield sought to admit testimony of Gray, Garrett's girlfriend, that Garrett called her immediately after hanging up with Stevens and told her what Stevens had said. Gray's testimony has an added level of analysis because it is hearsay within hearsay.
The rule regarding hearsay within hearsay provides that it is admissible if "each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Evid.R. 805. In other words, not only must Garrett's statement to Gray fall within a hearsay exception, but Stevens' statement to Garrett must also. We have already concluded that Garrett's testimony regarding Stevens' statement was inadmissible hearsay. Because one part of the hearsay within hearsay does not fall within an exception, the testimony must be excluded. Accordingly, Sinkfield's fourth assignment of error is overruled.
 V
Next, Sinkfield claims the trial court erred in prohibiting the testimony of Michael Stroud due to a Crim.R. 16 violation. When the defense submitted its final witness list prior to trial, Michael Stroud's name was not included. The defense argued that its private investigator identified Stroud as a witness only one day prior to the beginning of trial. However, the defense did not notify the state that it intended to call Stroud until during the defense case seven days later. The state argued that the failure to notify it of the witness was a Crim.R. 16 violation, and the witness should not be allowed to testify. After hearing arguments from both sides, and the proffered testimony of the witness, the trial court agreed with the state and prohibited Stroud from testifying.
Crim.R. 16(C)(1)(c) provides that a defendant is required to supply the state with a list of names and addresses of witnesses it intends to call at trial. Furthermore, both parties have a continuing duty to disclose witnesses as they are discovered, even after the list has been provided. Crim.R. 16(D). The rule states the following for failure to comply:
 If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.
Crim.R. 16(E)(3). Undoubtedly, the sanction of excluding testimony could infringe on a defendant's Sixth Amendment right to present a defense. Consequently, the supreme court has held that a trial court must make an inquiry into the circumstances surrounding the violation before imposing a sanction under this section. Lakewood v. Papadelis (1987),32 Ohio St.3d 1, 5. Some factors to be considered are (1) the extent of surprise or prejudice to the state; (2) the impact exclusion of the witness would have on the evidence and the outcome; (3) whether the violation was in bad faith; and (4) the effectiveness of less severe sanctions. Id. Moreover, the supreme court stressed that after considering these factors, the trial court must impose the least drastic sanction possible that is also consistent with the state's interest. The court qualified this requirement by expressing that exclusion was still permissible as long as it would not completely deny the defendant his constitutional right to present a defense. Id. at 6.
This court has previously addressed the impact of sanctioning a defendant with exclusion for violating Crim.R. 16. In State v. Amburgey, the defendant failed to timely notify the state of an eyewitness it intended to call until the day before trial. (1993), 86 Ohio App.3d 635,639. Without inquiring into the circumstances of this failure, the trial court excluded the witness from testifying. This witness was actually the only impartial eyewitness to the crime, and crucial to the defendant's case. After considering the balancing test set forth in Papadelis, including the trial court's failure to consider a lesser sanction, we held that the exclusion of this witness violated the defendant'sSixth Amendment right to present his case. Id. at 641.
During this analysis, we contrasted the facts of Amburgey with the facts of the Ninth District case of State v. Moon (1991),74 Ohio App.3d 162. Moon also attempted to introduce a witness for the first time during trial. However, the trial court excluded the witness relying on Moon's failure to suggest that the witness' testimony "could add anything to the proceedings that the other defense witnesses were unable to supply." Id. at 170. The appellate court affirmed on that basis. The Moon case is distinguished from Amburgey, where the witness excluded was the only impartial eyewitness who would testify for the defendant. Amburgey, supra.
We find the facts of Moon more similar to the present case than the facts of Amburgey. Here we have a witness the defense discovered the day before trial. However, instead of immediately notifying the state, the defense waited until after the state had rested its case before disclosing the witness. The proffered testimony indicated this witness would have described a meeting with James Brown, the state's main witness, wherein James Brown recanted his identification of Sinkfield. While this is arguably important testimony to the defense, it is not necessarily violative of his Sixth Amendment rights.
When considering the factors set forth in Papadelis, we find that the defendant's failure to disclose the witness was not willful or in bad faith. The defense attorney explained that he did not learn of the witness until immediately prior to trial, and thought that his secretary had notified the state. The state claims it was not notified until either the day of or the day before the witness was supposed to testify; in any event, after the state had rested its case. Therefore, the surprise to the state is evident. Moreover, the state would have been prejudiced in that James Brown had already testified, and the state rested, before it could allow Brown to explain or refute any meeting with Michael Stroud where he may have recanted his identification. A lesser sanction than exclusion probably could not have remedied this situation.
In addition, we find that the testimony proffered by Stroud was not unique. Tony Hill had also testified that Brown had recanted his identification of Sinkfield. Consequently, doubt had already been cast on Brown's identification. Similar to the witness in Moon, Stroud was not going to add something different to the proceedings that could not be provided by other witnesses. For this reason, the witness' absence likely had no impact on the outcome of the trial.
The imposition of sanctions for a discovery violation is generally within the sound discretion of the trial court. State v. Parson (1983),6 Ohio St.3d 442, 445. After applying the Papadelis analysis to the exclusion of testimony, we do not find that the trial court abused its discretion in excluding the testimony of Michael Stroud. Accordingly, Sinkfield's fifth assignment of error is overruled.
 VI
In his final assignment of error, Sinkfield challenges the admission of rebuttal testimony by Detective Burke regarding a statement allegedly made by Stevens at the jail in February of 1999. When Stevens testified at trial, the state asked him on cross examination if he told Detective Burke and Sergeant White over at the jail that Steven Cantrell and Tony Hill offered him money to accept responsibility for these crimes. In response, Stevens denied making this statement. The state called Detective Burke and Sergeant White on rebuttal and both testified that Stevens had told them during this February 1999 conversation at the jail that Hill and Cantrell had offered him money to take the fall for these crimes. Sinkfield argued at trial and on appeal that this rebuttal testimony was improper impeachment and was actually being offered for substantive proof the bribe was offered. The state responded that the testimony was elicited from the officers on rebuttal simply to impeach Stevens' credibility by prior inconsistent statement.
Evid.R. 613(B) allows the use of extrinsic evidence to impeach by prior inconsistent statement when the following two steps are satisfied:
 (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
 (2) The subject matter of the statement is one of the following:
 (a) A fact that is of consequence to the determination of the action other than the credibility of a witness;
 (b) A fact that may be shown by extrinsic evidence under Evid. R. 608(A), 609, 616(B) or 706;
 (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.
When Stevens testified, he flatly denied ever telling the officers that he was offered a bribe. Therefore, this is a classic example of rebuttal testimony elicited to impeach a witness with a prior inconsistent statement after being given an opportunity to explain or deny the statement. We have no difficulty finding that the first step of the rule was satisfied.
As to the second step, the state alleges that the subject matter of the statement, that Hill and Cantrell offered Stevens a bribe to take the fall for the crimes, was of consequence to the determination of the action because of Hill's importance to the defense. Hill testified at trial both that the state's key witness, James Brown, had recanted his identification of Sinkfield, and that Watson had essentially confessed to committing the crimes with Stevens, thus exonerating Sinkfield. Because the officers' rebuttal testimony, although presented to impeach Stevens' testimony, also potentially had the added effect of attacking Hill's credibility, the state believed it was of consequence to the determination of the case. We do not agree with the state's analysis.
The question asked of both Stevens on cross examination and Detective Burke and Sergeant White on rebuttal, was whether Stevens had told the officers that he had been offered the bribe. Stevens said he never told them that. The officers said he did. The issue then is whether Stevens made the statement, not whether the bribe was ever actually offered. Consequently, the effect of the officers' testimony on Hill's credibility could only be minimal at best. This is particularly true in light of the incredible nature of Stevens' testimony, as agreed by both parties to this action. Stevens' testimony was so unbelievable, even when reviewed in a transcript, that the credibility of anything he has said before or during trial, could not possibly have been given much weight by the jury.
Furthermore, even if the jury were to question whether the bribe was offered, it would not have any effect on Sinkfield's guilt or innocence. Nearly every witness confirmed that "Turtle" was Stevens' nickname, and the eyewitnesses verified that "Turtle" was the gunman, and there was also another man involved. Any confession made by Stevens would not exonerate Sinkfield, because it is alleged that Sinkfield was the other perpetrator. Therefore, any alleged bribe offered for Stevens to "take the fall" would have no effect on Sinkfield's plight. In any event, whether Stevens made this statement to the officers three years after the crimes occurred is likely not a matter of consequence to the determination of Sinkfield's guilt or innocence.
It follows that the state attempted to impeach Stevens on a matter which is not material to any issue of consequence in the trial. We also do not find that the state could justify the testimony under (b) or (c) of Evid.R. 613(B)(3). Therefore, we do not believe Evid.R. 613(B)(2) was satisfied to allow admission of the rebuttal testimony on such a collateral matter.
Nevertheless, we do not find the error to be prejudicial. As we have established, technically, the state proceeded properly by questioning Stevens about the statement and allowing him to explain or deny it on cross examination. When he denied it, this opened the door for the state to impeach his credibility through a prior inconsistent statement. The only error is that the issue was collateral and therefore not of consequence to the outcome of the trial. The supreme court has set the following standard for harmless error in evidentiary issues:
 Error in the admission of evidence in criminal proceedings is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt.
State v. Bayless (1976), 48 Ohio St.2d 73, paragraph seven of the syllabus, vacated on other grounds, 438 U.S. 911, 98 S.Ct. 3135.
The officers' testimony probably had no effect on Stevens' credibility because he had so little credibility to begin with. As to Hill's credibility, as stated previously, because Stevens' credibility was inferior at best, anything he did or did not say about Hill at any time could not have held much weight with the jury. Furthermore, Hill admitted on the stand that he and Sinkfield were good friends, so any bias he may have in Sinkfield's favor was already before the jury. Considering also how insignificant the alleged bribe would be to Sinkfield, Hill's credibility was likely not affected by the testimony of the officers. At any rate, the testimony did not produce any prejudicial effect sufficient to warrant a new trial. See State v. Kehn (1977), 50 Ohio St.2d 11, 20.
Based on the foregoing, we find that though admissibility of the rebuttal testimony was doubtful, its admission resulted in harmless error. Accordingly, Sinkfield's sixth assignment of error is overruled.
Judgment affirmed.
FAIN, J., and YOUNG, J., concur.
[1] The Chambers Court explained that at the time of this case, Mississippi did not even recognize a statement against penal interest exception to hearsay. Instead, the exception was limited to statements against pecuniary or proprietary interest.
[2] We recognize that this finding of the Supreme Court is actually contrary to the present requirement in the Rules of Evidence that the declarant must be unavailable to admit a statement against interest. However, this conflict has no bearing on our analysis.